## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Tennelle Dulinski, | Case No. 20-cv-2207 (SRN/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| North Homes, Inc. *doing business as* North Homes Children and Family Services, | |
| Defendant. | |

Andrew P. Muller, Muller, Muller and Associates PLLC, 310 Fourth Avenue South, Suite 5010, Minneapolis, MN 55415; and John A. Klassen, John A. Klassen, PA, 310 Fourth Avenue South, Suite 5010, Minneapolis, MN 55415, for Plaintiff.

David M. Wilk and Kaylin Schmidt, Larson King, LLP, 30 East Seventh Street, Suite 2800, Saint Paul, MN 55101, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Motion for Summary Judgment [Doc. No. 28] filed by Defendant North Homes, Inc. ("North Homes"). Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court **GRANTS** the motion.

## I.    BACKGROUND

This case arises out of the termination of Plaintiff Tennelle Dulinski's employment as a Mental Health Practitioner ("MHP") with North Homes. In setting forth the factual background of the case, the Court is mindful that in considering North Homes' summary

1

judgment motion, it must "view[] the evidence in the light most favorable to the nonmoving party," namely, Dulinski. *Grinnell Mut. Reinsurance Co. v. Schwieger*, 685 F.3d 697, 700 (8th Cir. 2012) (internal quotation marks and citation omitted). Moreover, the Court does not "weigh the evidence" or "determine the truth of the matter" at this stage of the litigation. *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012).

### A.    The Parties

Dulinski is a Minnesota resident. (Compl. [Doc. No. 1] ¶ 1.) She worked as an MHP for North Homes from September 11, 2017, through July 18, 2019. (*Id.* ¶¶ 6, 30; Declaration of Andrew P. Muller [Doc. No. 41 ("Muller Decl.") Ex. 4 ("2018 Annual Review") at 1, Ex. 2 ("Emerson Dep.") 59:24-60:21.)

Defendant North Homes was founded in 1990 and is a Minnesota non-profit corporation "that provides mental health services to children and families." (Compl. ¶ 2; Declaration of Rochelle DelGreco ("DelGreco Decl.") [Doc. No. 34] ¶ 3.) North Homes employs MHPs and administrative staff to serve 14 school districts and communities in Minnesota. (DelGreco Decl. ¶ 3.)

North Homes offers a Children's Therapeutic Services and Supports ("CTSS") program. (*Id.* ¶ 2.) The CTSS program offers mental health services by means of a school-based program and a community-based program. (*Id.* ¶ 4.) The school-based program takes place at a school and serves students who have at least one mental health diagnosis relating to severe behavioral or emotional issues and have therefore been removed from mainstream classes. (*Id.* ¶¶ 4-5.) The community-based program usually takes place at a

child's home and "provides one-on-one skills training" that addresses "issues unique to the child's home, such as relationships with parents or siblings." (*Id.* ¶ 4.)

To facilitate the school-based program, North Homes enters contracts with a number of schools. (*Id.* ¶ 6.) Under each contract, North Homes agrees to provide mental health therapy and skills training, and agrees to follow all school policies and decisions. (*Id.*) Mental health therapy focuses on addressing a student's thoughts and feelings. (*Id.* ¶ 10.) Skills training focuses on developing de-escalation and coping skills "such as anger management and deep breathing." (*Id.*; Declaration of David M. Wilk [Doc. No. 31] ("Wilk Decl.") Ex. 1 ("Dulinski Dep.")[1] 44:8-9.)

### B.    Southwest Elementary School

During the 2016-2017 academic year, Southwest Elementary School ("Southwest"), located in Grand Rapids, Minnesota, decided to develop a school-based day treatment program for students with emotional and behavioral disorders. (Declaration of Chris Brown [Doc. No. 35] ("Brown Decl.") ¶¶ 1-2; *see* DelGreco Decl. ¶ 9.) Headed by Chris Brown, one of Southwest's special education teachers from 2016 to May 2019, Southwest developed a program to help students overcome their disabilities and return to regular classes. (Brown Decl. ¶¶ 1, 3.) To help with this program, Southwest entered a contract with North Homes. (*Id.* ¶ 4.) Southwest was also assigned four paraprofessionals as educational special personnel ("ESP") to assist with the program. (*See* Dulinski Dep. 40:4-

---

[1]    Additional excerpts of Dulinski's Deposition are in the record at Exhibit 8 to the Muller Declaration. Going forward, the Court simply cites to the "Dulinski Dep." without distinguishing between the Muller and Wilk Declarations.

5; Muller Ex. 1 ("Stephens Dep.") 102:15-21; *see also* Brown Decl. ¶ 6; Muller Decl. Ex. 3 ("Rubesh Dep.") 24:5.)

### C.  Dulinski's Employment at North Homes

On September 11, 2017, North Homes hired Dulinski as an MHP to provide school-based skills training to students at Southwest.  (Compl. ¶ 6; Stephens Dep. 8:23-9:1; Dulinski Dep. 42:14-17; 2018 Annual Review at 1.)  She was not hired to provide mental health therapy because she lacked the qualifications to do so.  (Dulinski Dep. 42:14-21.)  Instead, North Homes' employee, Becky Zidarich, was assigned to provide mental health therapy to Southwest students.  (Declaration of Becky Zidarich [Doc. No. 36] ("Zidarich Decl.") ¶ 3; Brown Decl. ¶ 8; Dulinski Dep. 42:8-13.)

Dulinski was assigned two supervisors, one for administrative tasks and another for her clinical work.  (Stephens Dep. 8:1-16; Dulinski Dep. 39:16-23.)   James Stephens was Dulinski's administrative supervisor.  (Stephens Dep. 8:1-5; *see* Dulinski Dep. 90:12-17.)  Stephens testified that he has worked at North Homes for 27 years, including at least 18 years as an MHP.  (Stephens Dep. 5:20-25, 7:11-14.)  Currently, he is the administrative director in Itasca County for the CTSS school-based and community-based programs, in addition to North Homes' targeting and case management programs.  (*Id.* at 6:11-18, 7:19-20.)

Katie Rubesh was Dulinski's clinical supervisor.  (Dulinski Dep. 39:16-23.)  Rubesh testified that she has worked at North Homes for nine years and is currently the Clinical Director of the CTSS program.  (Rubesh Dep. 6:16-7:1.)  She has more responsibility under

her current role than she did during Dulinski's employment; at that time, Rubesh was the Clinical Director only for the Grand Rapids' school district. (*See id.* at 7:11-13.)

About six months after Dulinski began working for North Homes, Stephens conducted Dulinski's first performance review. (*See generally* 2018 Annual Review.) That review demonstrated that Dulinski was exceeding her production goals and she received high marks in relation to her major job responsibilities. (*Id.* at 1, 4-5; Stephens Dep. at 71:23-72:3.) The only items noted for improvement related to paperwork deadlines and communication with her co-workers. (2018 Annual Review at 5.)

Around the same time, however, the four ESPs at Southwest approached Rubesh regarding Dulinski. (Rubesh Dep. 20:24-21:1, 23:15-25:11.) Rubesh testified that the ESPs had ongoing concerns regarding Dulinski that they wanted to share with North Homes anonymously. (*Id.* at 23:18-23.) To facilitate their request, Rubesh created an online survey for the ESPs to complete. (*Id.* at 21:2-4.)

By means of that survey, the ESPs expressed their concerns. (*See* Wilk Decl. Ex. 5 ("ESP Complaints"); Rubesh Dep. 20:18-23:11.) Among other things, they wrote that Dulinski seemed unprepared for her skills training sessions. (ESP Complaints at 1.) They also wrote the Dulinski made "negative comments" and would "put the child or children back into negative thinking" by bringing up past behaviors that had already been addressed. (*Id.*) One ESP stated that Dulinski had "set the kids off to a meltdown," while another noted that she did not follow a hands-off approach during a child meltdown situation. (*Id.*) And they noted Dulinski's unprofessional clothing. (*Id.* at 2.) Rubesh went through these

responses, "summed up the biggest concerns," and "then had a meeting with [Dulinski] about th[em]."  (Rubesh Dep. 24:25-25:4.)

Following the 2017-2018 academic year, Dulinski worked at North Homes' summer camp.  (Declaration of Tennelle Dulinski [Doc. No. 43] (Dulinski Decl.) ¶ 2.)  After the summer, she returned to Southwest for the 2018-2019 academic year.  (*See* Stephens Dep. 8:1-5.)

### D.   Dulinski's Injury

In September 2018, Dulinski was injured by her dog.  (Wilks Decl. Ex. 7 [Doc. No. 32] at 19; Dulinski Dep. 22:10-14.)  The dog hit the bottom of Dulinski's jaw when it jumped up.  (Wilks Decl. Ex. 7 at 19.)  The force caused sudden hyperextension of the neck, resulting in double vision and pain.  (*Id.*)  This injury also impacted her cognitive functioning.  (Dulinski Dep. 63:9-21.) These and other symptoms are permanent, but their severity can fluctuate.  (*See id.* at 33:2-5, 101:25-102:3.)

Dulinski met with her physician, Dr. Hilde-Philips, on four occasions over the course of six months and was eventually diagnosed with Chiari Malformation, Type I. (Wilk Decl. Ex. 8 at 2; Dulinski Dep. 32:9-11; Compl. ¶ 10.)  This is a brain condition that can cause a variety of neurologic issues including dizziness, headaches, nausea, and lack of concentration.  (Wilk Decl. Ex. 8 at 2; Dulinski Dep. 80:20-21.)  After this diagnosis, Dr. Hilde-Philips referred Dulinski to the Mayo Clinic.  (Wilk Decl. Ex. 8 at 2, 4.)

On March 13, 2019, Dulinski informed North Homes about her brain injury. (Dulinski Dep. 33:13-18.)  She met with her supervisors, along with Hilary Emerson, the Human Resources Director, and Michelle DelGreco, the Chief Operations Officer.

(Dulinski Dep. 80:18-20; Muller Decl. Ex. 2 ("Emerson Dep.") 6:18-22; DelGreco Decl. ¶ 1.)  Her husband accompanied her to this meeting to help explain her condition.  (*See* Stephens Dep. 40:2-6, 40:16-18.)

At this meeting, Dulinski also requested intermittent FMLA leave because she would need to miss work related to her illness.  (Dulinski Dep. 33:19-22; *see* Emerson Dep. 28:20-25.)  North Homes approved this request.  (Dulinski Dep. 30:13-17, 33:23-34:1; Emerson Dep. 39:16-18.)

### E.  Dulinski's Second Performance Evaluation

The next day, March 14th, Stephens completed Dulinski's annual review for the year of 2018.  (Stephens Dep. 77:19, 78:19-23, 82:19-22; Wilk Decl. Ex. 3 ("2019 Annual Review") at 1.)  Stephens gave Dulinski an overall rating of 3.14, indicating that she exceeded expectations.  (2019 Annual Review at 1.)  Because of this rating, Dulinski was eligible to receive a merit-based salary increase.  (*See* Stephens Decl. 81:5-8.)

### F.  Dulinski Requests FMLA Leave

A week or so later, Dulinski made a request to take FMLA leave.  North Homes had scheduled a training session for March 29, 2019.  (*See* Stephens Dep. 89:10-15.)  Dulinski provided North Homes with a doctor's note, stating that she could not attend the afternoon session, which was the hands-on portion of the training, because of her brain condition.  (Dulinski Dep. 95:21-97:5.)  North Homes approved this request.  (*See* Stephens Dep. 87:9-16; Emerson Dep. 46:5-8.)

Shortly thereafter, prior to the training, Dulinski suffered intense symptoms due to her brain injury and again requested intermittent FMLA leave.  (Dulinski Decl. ¶ 3.)  She

experienced headaches, vision trouble, fatigue, and dizziness. (*Id.*) Consequently, she took FMLA leave by ending early her shift on March 26 and 27 and missing the full day on March 28. (*Id.*) As previously scheduled, she took intermittent FMLA leave on Friday, March 29, during the afternoon portion of the training session. (Dulinski Dep. 96:4-7; Stephens Dep. 89:16-25.)[2]

### G.     Brown's Email

On March 29, 2019, the same day as the training session, Brown sent an email to Rubesh and Stephens regarding "some concerns/issues we have been having" with Dulinski. (DelGreco Decl. Ex. A ("Brown Email") at 2-3.) As noted above, Brown was the driving force behind Southwest developing its day treatment program. (*See* Brown Decl. ¶¶ 2-3.) As such, he was North Homes' contact at Southwest and was responsible for the classroom in which Dulinski worked. (DelGreco Decl. ¶ 9.)

Brown stated that, although "this is a slippery slope with where she is at physically/mentally/emotionally and me not necessarily being in a supervisor role," he felt compelled to share his concerns about Dulinski with her supervisors. (Brown Email at 2.) He then explained that Dulinski had continued to engage in activity that he had previously spoken with her about, as follows:

> The issues we have addressed in the past are happening again and are causing
> some unrest with not only the ESPs but also with some of the kids. She has
> started to randomly insert/assert herself in the classroom again and has taken
> to putting points on the data sheet without consulting with the rest of the staff

[2]     Although the timing is unclear, Dulinski also asked to wear sunglasses as an accommodation for her disability, which Stephens granted. (Stephens Dep. 41:22-42:3; Dulinski Dep. 169:10-15.)

again (this drives the ESPs crazy). This is minor stuff but since we have covered it at least twice before with her, I felt the need to include it. I have also listened to some of her Skills Sessions and feel that there isn't much depth to them, they are random and not planned out ahead of time, there is a negative undertone to them, and most importantly I feel that she is being overly negative with the kids (and sometimes pushing them over the edge intentionally). I know that the ESPs also feel the same way as they have spoken with me numerous times about it. Lately, group has rarely started on time and seems to end early more often than not. I know she has had to deal with some personal health issues lately, so that may or may not be the cause of it. I also don't know what time she is supposed to leave, but it seems that she is leaving earlier than usual (usually by 1:00 or 1:30).

(*Id.*) Next, he addressed tension between Dulinski and Zidarich, as outlined below:

I'm also sensing some tension between her and Becky and feel that she is going out of her way to make Becky feel uncomfortable and not necessarily a part of things here based on some things she's said and done. Becky has expressed feeling uncomfortable around her and not feeling like they are meshing very well. . . . In my opinion, Becky is not only a wonderful person but does an amazing job with the kids and truly cares about them. We need her more than I could ever express to you in writing. She has been an integral part of any/all of the successes we've had over the last couple of years. I don't want to imagine this program without her . . . I know it may happen at some point, as we cannot predict the future, but it shouldn't happen because of feeling uncomfortable/unwelcome as a result of a co-workers [sic] words/actions.

(*Id.*) And he concluded by noting the following:

I truly like Tennelle as a person and think she bring some positive things to the program but I also feel that at this moment the negatives outweigh the positives. I'm not sure if this is even within the auspices of my job, but I felt it was important to share with you. . . . I would also respectfully ask that this stays between the three of us as I don't want either Becky or Tenelle [sic] to know that I communicated this to you – I think it could negatively impact the working and personal relationship I have with both of them.

(*Id.*) Upon receiving this email, Rubesh forwarded it to DelGreco, who, in turn, forwarded it to Emerson, writing, "This is bad!!!" (*Id.* at 1.)

On Monday, April 1st, Rubesh met with Brown at Southwest to discuss his email. (Rubesh Dep. 39:19-40:1; Brown Decl. ¶ 10.)  During that conversation, Brown "was very direct" that "Dulinski could not be allowed back to Southwest Elementary," (Brown Decl. ¶ 10), explaining that "he just did not feel that Tennelle could work in their program any more," (Rubesh Dep. 40:7-9).  Rubesh responded that the "school has the right to not have an employee of [North Homes] in their program if they feel it's detrimental."  (*Id.* at 40:12-15.)  However, she explained that, if it removed Dulinski, it was unlikely that North Homes could find a replacement for her before the end of the academic year.  (Brown Decl. ¶ 10.)  Brown responded that "given the negative impact Dulinski had on the students, staff and program, Zidarich and I would take over her responsibilities ourselves."  (*Id.*)

Next, Rubesh called Southwest's special education director, Brent Brunetta, to discuss Brown's concerns.  (Rubesh Dep. 40:22-41:12.)  She wanted to confirm that the special education department agreed with Brown's desire to remove Dulinski.  (*Id.* at 41:2-4.)  Brunetta stated that they would support "whatever Chris feels is best for the program."  (*Id.* at 41:3-5.)

Following these conversations, Rubesh reported back to DelGreco and Stephens.  (*See* DelGreco Decl. ¶¶ 11-13.)  She explained that "Brown was adamant that Dulinski not return to Southwest Elementary."  (*Id.* ¶ 11.)  She also expressed "her own concerns about Dulinski's performance and Dulinski's apparent inability to change her behavior."  (*Id.*)  She further explained that Zidarich "had concerns about Dulinski's performance and behavior."  (*Id.*)  Lastly, she confirmed that Brunetta supported Brown's decision.  (*Id.* ¶ 12.)

### H.    North Homes Removes Dulinski from Southwest

Taken together, the three of them agreed that they "had no choice" but to remove Dulinski from Southwest.  (*Id.* ¶ 13.)  This is because North Homes "serve[s] at the pleasure of the school" and it "cannot require a school to continue to allow [its] staff on campus" nor could it "demand that [its] staff participate in a school's day treatment program."  (*Id.* ¶ 7.)  In light of this feedback, DelGreco also believed that North Homes "could not place Dulinski in another school-based position."  (*Id.* ¶ 15.)  Rubesh then texted Dulinski to leave Southwest and meet at her office.  (Dulinski Decl. ¶ 6.)

#### 1.    April 1st Meeting

Later that day, Dulinski met with Rubesh and Stephens, and they informed Dulinski that she was no longer going to work at Southwest.  (Dulinski Dep. 59:17-24.)  Dulinski stated that Stephens and Rubesh told her that Southwest was "restructuring the program" and that she "did nothing wrong."  (*Id.* at 60:20-21; Dulinski Decl. ¶ 7.)  Dulinski also testified that, after collecting her personal belongings from Southwest, Rubesh informed her that she "could start [her] FMLA right then and there."  (Dulinski Dep. 64:17-65:1.)[3]

#### 2.    April 4th Meeting

Next, Dulinski met with Emerson and Stephens on April 4th.  (*Id.* at 85:12-15.)  At that meeting, Dulinski asked if she could return to her school-based position at Southwest.  (*Id.* at 85:16-17.)  Stephens stated that Southwest was restructuring and offered her the

---

[3]    Although it is not material, Stephens and Rubesh remember this meeting differently. (*See* Stephens Dep. 112:1-24; Rubesh Dep. 44:3-45:1.)  Given the procedural posture of the proceedings, the Court has taken the facts in the light most favorable to Dulinski.

community-based position. (*Id.* at 85:18-22.) They informed her that she may have to transport students in her vehicle. (*Id.* at 90:8-11.) They provided Dulinski with a copy of the job description of the community-based position to show to her physician. (*See id.* at 85:23-25; DelGreco Decl. Ex. B)

Over the next few days, Dulinski communicated with Stephens. (*See* Dulinski Dep. 91:25-93:23; *see also* Wilk Decl. Ex. 11 at 2.) For example, she called Stephens on April 5th to tell him that she wanted to take Paid Time Off ("PTO"). (Dulinski Dep. 92:16-25; Wilk Decl. Ex. 11 at 2.) She also spoke with him on April 9th, asking to take PTO and FMLA for an appointment at the Mayo Clinic and again asked to be returned to her school-based position. (Dulinski Dep. 93:12-23.)

Meanwhile, on April 8th, Dulinski had an appointment with Dr. Hilde-Philips and showed her the job description for the community-based position. (*Id.* at 86:6-9, 90:22-91:3, 93:5-11.) Dr. Hilde-Philips concluded that Dulinski could not perform the community-based role. (*Id.* at 86:17-20.) She outlined her medical opinion in a letter dated April 9, 2019, detailed in part as follows:

> It is in my best medical judgment that the patient should be working only days and no more than 6-8 hours per shift. Given the above symptoms, it is completely inappropriate for her to be driving other than to and from work. Certainly it is a safety issue given the problems with hand coordination that she would be transporting other people including children. Also the medication that she has been prescribed to limit her symptoms she is taking at times when she is not in the workplace. Since her symptoms seem to be most severe later in the day likely due to fatigability, this is when her medications are being taken. The medications can potentially cause cognitive impairment. Hence another reason why she should be working straight days.

(Wilk Decl. Ex. 12 at 1-2.) Dulinski provided this letter to North Homes on April 23, 2019. (Wilk Decl. Ex. 11 at 2.)

On April 24th, Emerson sent an email to Dulinski, withdrawing the community-based position that North Homes had previously offered her on April 4th. (Wilk Decl. Ex. 11 at 1; Dulinski Dep. 106:7-12.) She explained that, "based solely on the restrictions outlined in [her] physician letter," North Homes did "not feel it would be in [its] best interest at this time to allow [her] to accept the Community Based CTSS position." (Wilk Decl. Ex. 11 at 1.) She further explained that the community-based position was "the only position" that North Homes had available to her "based on the performance concerns that were discussed with [her] on Monday April 1st." (*Id.*) Consequently, North Homes felt "it would be most appropriate for [her] to begin [her] FMLA leave to allow" Dulinski time "to seek medical treatment for [her] own serious health condition." (*Id.*) Lastly, she noted that Dulinski could have the community-based position at the end of her FMLA leave or when her physician lifts her work restrictions. (*Id.* at 2.) However, she also noted that her employment will end if, at the end of her leave, she cannot perform the essential functions of the community-based position. (*Id.*)

Dulinski contacted Emerson a few times after receiving this email. (*See* Wilk Decl. Exs. 13-15.) On June 4, 2019, she asked when her FMLA leave ended. (Wilk Decl. Ex. 15.) Emerson responded that Dulinski's FMLA leave ended on June 30, 2019. (*Id.*) In late June, Dulinski asked Emerson whether North Homes had received a medical document "clearing [her] to return to [her] original day time position." (Wilk Decl. Ex. 14.) Emerson responded, explaining that Dulinski could not return to Southwest "per their request" and

could not accept the community-based position due to her "current restrictions" that prohibited her from "perform[ing] the essential duties."  (*Id.*)

On July 18, 2019, North Homes terminated Dulinski.  (Emerson Dep. 60:5-9.) Emerson explained that they terminated her because "she had exhausted her PTO as well as her FMLA time" and, although they "looked for positions for her to be able to move into," North Homes "didn't have any positions" that she could perform given her medical restrictions.  (*See id.* at 60:16-21.)

## I.     Procedural History

A few weeks later, Dulinski filed a charge of discrimination with the Minnesota Department of Human Rights, which was cross-filed with the Equal Employment Opportunity Commission on August 6, 2019.  (*See* Compl. ¶ 33; Answer [Doc. No. 4] ¶ 33; *accord Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 (8th Cir. 2006) (noting that, "before bringing suit in federal court," a plaintiff "must first timely file an administrative charge with the EEOC") (citing 42 U.S.C. § 2000e-5(e))).)  Dulinski then withdrew her charge on September 10, 2020, and "received her right-to-sue letter one week later."  (Compl. ¶ 33; *see* Answer ¶ 33.)

On October 21, 2020, Dulinski filed suit against North Homes.  (*See generally* Compl.)  Her complaint asserts federal and state law claims under the Americans with Disabilities Act ("ADA") (discrimination, failure to accommodate, and retaliation and coercion), the Family and Medical Leave Act ("FMLA") (entitlement, retaliation, and discrimination), and the Minnesota Human Rights Act ("MHRA") (discrimination, failure to accommodate, and unfair reprisal).  (Compl. ¶¶ 34-80.)

Defendant moved for summary judgment, arguing that Plaintiff's claims fail as a matter of law because she could not perform the essential functions of the community-based position and that was the only position available to her given her previous performance while at Southwest.  (Def.'s Mem. [Doc. No. 30] at 1-2, 14.)  In addition, Defendant argues that it attempted to accommodate Dulinski's disability in a number of ways, including by honoring her request to take FMLA leave.  (*Id.*)

## II.   DISCUSSION

### A.   Legal Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intel., Inc.*, 812 F.3d 701, 707 (8th Cir. 2016).  And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)

(internal quotation marks omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.

### B.    Overarching Legal Framework

In relevant part, federal employment law prohibits employers from discriminating against "a qualified individual on the basis of disability."   42 U.S.C. § 12112(a); *see* 42 U.S.C. § 12203 (prohibiting retaliation and coercion); 29 U.S.C. § 2615 (prohibiting FMLA discrimination and retaliation).   An employer discriminates when it takes an "adverse employment action" against an employee. *See, e.g.*, *Finan v. Good Earth Tools, Inc.*, 565 F.3d 1076, 1079 (8th Cir. 2009) (requiring an "adverse employment action" for ADA and MHRA discrimination claims); *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1007 (8th Cir. 2012) (requiring the same for FMLA discrimination and retaliation claims); *Heisler v. Metro. Council*, 339 F.3d 622, 632, 632 n.6 (8th Cir. 2003) (requiring the same for a retaliation claim under the ADA and explaining that this requirement applies to retaliation claims under the MHRA).

In general, an "adverse employment action" is a "tangible change in working conditions that produces a material employment disadvantage," such as a decrease in pay or benefits, termination, or any other change that "affect[s] an employee's future career prospects." *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1060 (8th Cir. 2016) (internal quotation marks and citation omitted).  However, "minor changes in duties or working

conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 632 (8th Cir. 2016) (internal quotation marks and citation omitted).

If a plaintiff demonstrates that the defendant took an "adverse employment action" against him or her during the actionable time frame, the plaintiff must then show that the defendant did this *because they engaged in* protected conduct.  The plaintiff can meet this burden in one of two ways.

First, a plaintiff can submit "direct evidence" showing "a specific link between the alleged discriminatory [or retaliatory] animus and an adverse action of such causal strength that the plaintiff can forgo the burden-shifting framework." *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 n.3 (8th Cir. 2016).  The Eighth Circuit has generally defined "direct evidence" as "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude." *Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 543 (8th Cir. 2018); *accord Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006) ("But 'stray remarks in the workplace,' 'statements by nondecisionmakers,' and 'statements by decisionmakers unrelated to the decisional process' do not constitute direct evidence.").

However, if the record contains no direct evidence of discrimination, as is often the case, the plaintiff may also prove discriminatory intent through the oft-utilized *McDonnell Douglas* burden-shifting framework.  *See, e.g.*, *Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 872-75 (8th Cir. 1998) (applying *McDonnell Douglas* burden-shifting framework to

discrimination claims under the ADA and the MHRA); *Rossley v. Drake University*, 958 F.3d 679, 685-86 (8th Cir. 2020) (same as to an ADA retaliation claim); *Burchett v. Target Corp.*, 340 F.3d 510, 515-18 (8th Cir. 2003) (same as to failure-to-accommodate claims under the ADA and the MHRA); *McLain v. Andersen Corp.*, 567 F.3d 956, 969 (8th Cir. 2009) (same as to an unlawful reprisal claim under the MHRA); *Pulczinski*, 691 F.3d at 1007 (same as to a FMLA discrimination claim); *Haskell v. CentraCare Health Sys.—Long Prairie*, 952 F. Supp. 2d 838, 848-49 (D. Minn. 2013) (same as to a FMLA retaliation claim).

Under this framework, the plaintiff must first prove a "prima facie" case. *E.g.*, *Wilking*, 153 F.3d at 872. If the plaintiff produces evidence supporting a prima facie case, "the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions," such as performance-related concerns. *Id.* at 872-73. If the defendant meets that burden, "the plaintiff then bears the burden of demonstrating that the employer's stated reason is pretextual" for unlawful conduct. *Id.* at 873.

Moreover, a plaintiff must do more than simply create a factual dispute regarding the issue of pretext. *Id.* at 874. For example, an employer's "[m]ere knowledge" of the employee's disability at the time of termination "cannot be sufficient to show pretext." *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1073 (8th Cir. 1998). Likewise, more than mere temporal proximity between a protected act and the adverse employment action is needed to establish pretext. *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1114 (8th Cir. 2001).

Since courts "do not sit as [] super-personnel department[s]," this "pretext" inquiry "is limited to whether the employer gave an honest explanation for its behavior," *not* on whether the business's action was "wise, fair, or even correct." *Wilking*, 153 F.3d at 873 (internal quotation marks and citation omitted). A district court will not substitute its own decision for that of the employer, even if the court believes that "the business decision was ill-considered or unreasonable, provided that the decisionmaker honestly believed the nondiscriminatory reason he gave for the action." *Pulczinski*, 691 F.3d at 1003 (internal quotation marks and citation omitted).

### C.     The Discrimination Claims

Dulinski alleges that North Homes violated the ADA and the MHRA by terminating her employment because of her disability. (Compl. ¶¶ 36, 47.) Dulinski further alleges that North Homes violated the FMLA by discriminating against her for using intermittent FMLA leave. (*Id.* ¶ 77.) Accordingly, the Court must determine whether a reasonable juror could find that North Homes fired Dulinski on July 18, 2019, because of her disability or because she used intermittent FMLA leave.

### 1.     ADA and MHRA

The ADA and the MHRA prohibit an employer from taking an adverse action against an employee because of the employee's disability. 42 U.S.C. § 12112(a); Minn. Stat. § 363A.08, subd. 2. Plaintiff's claims under both the ADA and the MHRA are analyzed under the *McDonnell Douglas* burden-shifting analysis, as outlined above. *Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439, 439 n.4 (8th Cir. 2007). To establish a prima facie case of disability discrimination under *McDonnell Douglas*, Dulinski must

show that: (1) she had a disability within the meaning of the ADA and the MHRA; (2) she was qualified to perform the essential functions of her job, with or without reasonable accommodation, and (3) she suffered an adverse employment action because of her disability. *Finan*, 565 F.3d at 1079.

Because Dulinski has not presented any direct evidence of disability discrimination, the Court must determine whether she has pointed to circumstantial evidence showing that North Homes fired her because of her disability.  The Court will assume, without deciding, that Dulinski has stated a prima facie case of disability discrimination under the ADA and the MHRA.  North Homes has explained that it terminated Dulinski because she exhausted her PTO and FMLA leave and could not perform the essential functions of the community-based position.  It also explained that it removed Dulinski from Southwest per its demand and could not place her in a different school-based position because of the negative feedback it received from Southwest.  Because North Homes has articulated legitimate, nondiscriminatory reasons for its actions, the question becomes whether Dulinski has presented evidence sufficient to create a fact issue that North Homes' proffered nondiscriminatory reasons were merely a pretext for unlawful disability discrimination.

The Eighth Circuit has held that the "trial judge is allowed to decide on a motion for summary judgment that the evidence is insufficient for a reasonable trier of fact to infer discrimination even though the plaintiff may have created a factual dispute as to the issue of pretext." *Wilking*, 153 F.3d at 874 (internal quotation marks and citation omitted).  To establish pretext, a plaintiff must present "proof that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason."

*Christopher*, 137 F.3d at 1073.  This requires the plaintiff to "do more than simply create a factual dispute as to the issue of pretext"; instead, plaintiff "must offer sufficient evidence for a reasonable trier of fact to infer discrimination." *Mathews v. Trilogy Communications, Inc.*, 143 F.3d 1160, 1165 (8th Cir. 1998).

Dulinski makes several arguments in her effort to establish pretext.  (*See* Pl.'s Opp'n [Doc. No. 41] at 20-23.)  First, she argues that North Homes has changed its explanation over time as to why it refused to reinstate her at Southwest, first telling her that Southwest was restructuring its program and now claiming Southwest had serious concerns about her performance.  (*Id.* at 20.)  Mixed in with this argument are allegations that North Homes has shifted its explanation regarding the availability of other school-based positions and that Dulinski never requested that North Homes accommodate her disability by being placed at another school.  (*Id.* at 20-21.)

Courts have found that "[s]hifting reasons can be evidence of pretext."  *Barron v. Decare Dental, LLC*, Civ. No. 12-699 (RHK/SER), 2013 WL 3989786, at *5 (D. Minn. Aug. 2, 2013).  But Dulinski still must demonstrate that the decision not to reinstate her at Southwest was discriminatory-based on her disability.  She offers no evidence to support that claim.  *See Mathews*, 143 F.3d at 1165 (affirming dismissal of discrimination claims because plaintiff failed to offer "sufficient evidence for a reasonable trier of fact to infer discrimination").

The overwhelming evidence demonstrates that North Homes received considerable negative feedback, and observed, that Dulinski's performance at Southwest was unsatisfactory.  North Homes was informed that Dulinski had caused unrest with the ESPs

and some of the students; she intentionally pushed some of the students "over the edge" and set them "off to a meltdown"; she made Zidarich "feel uncomfortable"; she made negative comments to the students; and she wore inappropriate clothing. (Brown Email at 2; ESP Complaints at 1-2; *see* DelGreco Decl. ¶ 11.)  North Homes was informed that these issues persisted despite Brown's and Rubesh's prior conversations with her about them. (Brown Email at 2; Brown Decl. ¶¶ 5,7; DelGreco Decl. ¶ 11; Rubesh Dep. 24:25-25:4.)

Importantly, Southwest, through Brown and Brunetta, demanded that Dulinski be removed from the day treatment program. (Brown Decl. ¶ 10; Brown Email at 2; Rubesh Dep. 40:7-41:12.) Nor could North Homes place Dulinski in another school-based position based upon this concerning feedback. (DelGreco Decl. ¶¶ 13, 15; Stephens Dep. 113:8-15; Wilk Decl. Ex. 11 at 1, Ex. 14.)  And there is no evidence that this decision was discriminatory-based on her disability.  Moreover, nothing suggests that North Homes withdrew the community-based MHP position for reasons other than her inability to perform the essential functions of that role due to her medical restrictions.

Second, Dulinski argues that these issues began as minor concerns and escalated inexplicably, demonstrating pretext, citing *Fitzgerald v. Action, Inc.*, 521 F.3d 867 (8th Cir. 2008). (Pl.'s Opp'n at 22-23.) In *Fitzgerald*, the Eighth Circuit held that plaintiff had presented sufficient evidence to create a factual dispute regarding pretext. 521 F. Supp. at 875-76. In that case, defendant fired plaintiff after he gave notice of surgery due to a work-related injury. *Id.* at 869-70. Defendant offered a legitimate, nondiscriminatory reason for firing plaintiff, namely, misconduct. *Id.* at 870, 875. In finding that plaintiff had created a factual dispute regarding pretext, the court highlighted, among other things, that

defendant terminated plaintiff "days after finding out about his upcoming surgery, but some two and a half months after the bulk of the accumulated misconduct occurred." *Id.* at 875.

Dulinski's case is distinguishable. Unlike *Fitzgerald*, the complained-of conduct here is not limited to discrete events that occurred months previously; rather, Dulinski's problematic conduct continued to occur throughout her tenure, culminating with Brown "feel[ing] the need to communicate" his "concerns/issues" with her supervisors. (Brown Email at 2; *see* ESP Complaints; DelGreco Decl. ¶ 11.) Moreover, North Homes acted within days of receiving Brown's email and removed Dulinski on the same day that Brown and Brunetta confirmed Southwest's demand that she be removed from the program. (*See* Rubesh Dep. 40:22-41:5; DelGreco Decl. ¶¶ 11-13.) *Fitzgerald* did not involve a client directly demanding that an employee be removed from its premises, nor did it involve a job where the employee had direct contact with vulnerable children. (*See* Brown Decl. ¶ 2 ("In addition, level-3 and level-4 students are at risk of harming themselves and harming others.").

Third, Dulinski argues that North Homes' explanation that it lacked confidence to place her in another school-based position is pretextual because it is undermined by her high-performance reviews. (Pl.'s Opp'n at 22.) However, this argument misses the point. North Homes never stated that Dulinski was not qualified for the school-based position. In fact, Emerson conceded that Dulinski was qualified. (*See, e.g.*, Emerson Dep. 55:7-15.) Rather, North Homes stated that it would not place Dulinski in another school-based

position because of the troubling performance issues she had at Southwest and it did not want to risk placing her in another school given these concerns.[4]

Simply put, North Homes' decision not to place Dulinski in a different school-based position, due to Southwest's concerning feedback, was an employment decision made in good faith. *See Floyd v. State of Missouri Dept. of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 937 (8th Cir. 1999) (finding that the decision not to offer the job to a qualified candidate because "she was not the right person for the job" was an employment decision). The Eighth Circuit has explained that courts "do not weigh the wisdom of any particular employment decision." *Id.* (internal quotation marks and citation omitted).

Lastly, Dulinski contends that she has demonstrated pretext because North Homes knew she would never be able to perform the duties of the community-based position. (Pl.'s Opp'n at 18.)  But the facts in the record do not support this contention.  Specifically, viewing the facts in the light most favorable to Dulinski, North Homes offered Dulinski the community-based position on April 4, 2019.  (Dulinski Dep. 85:12-22, 89:21-90:3.) There is no evidence that North Homes thought she could not perform the essential functions of that position.  And it was not until nineteen days later that Dulinski informed North Homes that she could not perform those functions.  (Wilk Decl. Ex. 11 at 2, Ex. 12.)

---

[4]      Federal courts have also made clear that evidence that the employee received high performance reviews, "without more," is insufficient to establish pretext. *Floyd v. State of Mo. Dep't of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 937 (8th Cir. 1999). Importantly, Stephens, who filled out the performance reviews, after being informed of Brown's email and other complaints, agreed that Dulinski should not return to a school-based position. (*See* Stephens Dep. 113:21-114:14.)  Dulinski has not pointed to anything more to establish pretext.

In fact, there is no evidence that Dulinski even knew she could not perform the essential functions of that role prior to speaking with her physician.  (*See* Dulinski Dep. 85:23-86:20.)

For these reasons, the Court grants summary judgment to Defendant on Dulinski's discrimination claims under the ADA (Count 1) and the MHRA (Count 3).

### 2.    FMLA

"The FMLA provides eligible employees up to 12 workweeks of unpaid leave during any 12–month period." *Marez v. Saint–Gobain Containers, Inc.*, 688 F.3d 958, 963 (8th Cir. 2012) (internal quotation marks and citation omitted).  An employer may not "interfere with, restrain, or deny the exercise of or attempt to exercise, any right" under the FMLA.  29 U.S.C. § 2615(a)(1).  Two types of claims exist under § 2615(a)(1), entitlement claims and discrimination claims.  *Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 864-65 (8th Cir. 2015).  There is also a retaliation claim under § 2615(a)(2).  *Burciaga v. Ravago Americas LLC*, 791 F.3d 930, 934 n.2 (8th Cir. 2015).

Dulinski asserts a FMLA discrimination claim against North Homes.  A discrimination claim occurs when "an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA." *Pulczinski*, 691 F.3d at 1006.  "An employee making [a discrimination] claim must prove that the employer was motivated by the employee's exercise of rights under the FMLA." *Id.*  Using FMLA leave "does not give an employee any greater protection against termination for reasons unrelated to the FMLA than was available before." *Malloy v. U.S. Postal Serv.*, 756 F.3d 1088, 1090 (8th Cir. 2014).

For Dulinski to establish a prima facie case of FMLA discrimination, she must show: "(1) that [s]he engaged in activity protected under the Act; (2) that [s]he suffered a materially adverse employment action, and (3) that a causal connection existed between [her] action and the adverse employment action." *Pulczinski*, 691 F.3d at 1007. As noted above, when there is no direct evidence, "an FMLA discrimination claim is analyzed under the *McDonnell Douglas* burden-shifting framework." *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1016 (8th Cir. 2013).

The Court assumes, without deciding, that Dulinski has established a prima facie case. North Homes has articulated the same legitimate, nondiscriminatory justification for its conduct—it made an employment decision that it could not place Dulinski in a school-based setting given Southwest's feedback and she could not perform the essential functions of the community-based position. Accordingly, the Court must determine whether Dulinski can show that these reasons were merely a pretext for unlawful FMLA discrimination.

In an effort to show pretext, Dulinski contends that other similarly situated employees, who did not take FMLA leave, were treated differently than she was treated. (Pl.'s Opp'n at 22.) She identifies at least three MHPs who did not take FMLA leave and, rather than be terminated, received progressive discipline in response to their performance issues. (*Id.* at 4, 22.)

To be sure, a plaintiff can demonstrate pretext by showing that "other employees were similarly situated in all relevant respects," but were treated differently. *Burciaga*, 791 F.3d at 935. However, at the pretext stage of the *McDonnell Douglas* burden-shifting

framework, "the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Id.* (internal quotation marks and citation omitted). The employees "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing characteristics." *Id.* (internal quotation marks and citation omitted); *Bone v. G4S Youth Services, LLC*, 686 F.3d 948, 956 (8th Cir. 2012).

*Bone* illustrates the strictness of this inquiry. There, plaintiff was terminated after engaging in forbidden conduct without receiving progressive discipline. *Id.* at 956. Plaintiff argued that defendant's proffered reason for termination was pretextual, citing other employees were treated more favorably than she was in disciplinary matters, including by receiving progressive discipline. *Id.* The Eighth Circuit held that the co-workers were not similarly situated for pretext purposes because plaintiff's forbidden conduct differed "in kind" from the allegedly similar co-workers' forbidden conduct. *Id.* The court explained that, although the other workers engaged in a range of misconduct, plaintiff was the only worker accused of "resisting the directives" of the client and with "outright refusal to comply" with her supervisor's request. *Id.* at 955-56. As such, the Eighth Circuit concluded that the co-workers were not similar situated with plaintiff in all relevant respects. *Id.* at 956.

Here, although the other individuals were MHPs who worked under the same supervisor, there is no evidence that they engaged in the same misconduct. Specifically, there is no evidence that they caused unrest with the ESPs at their respective schools, that they intentionally pushed students "over the edge," that they made therapists "feel

27

uncomfortable," that they made negative comments to the students, or that they wore inappropriate clothing.  Notably, there is no evidence that the schools where they worked had emailed or called North Homes indicating that they wanted those employees removed from their programs.  Consequently, under Eighth Circuit precedent, these MHPs are not similarly situated and thus no reasonable juror could infer from North Homes' use of progressive discipline with them that North Homes terminated Dulinski due to her disability.

Because Dulinski has failed to present evidence that North Homes' nondiscriminatory explanations were pretextual, the Court grants summary judgment on Dulinski's FMLA discrimination claim (Count 8).

### D.   Failure-to-Accommodate Claims

Dulinski contends that North Homes violated the ADA and the MHRA by refusing to grant her requests for reasonable accommodations.  (Compl. ¶¶ 37, 53.)  An employer violates the ADA and the MHRA if the employer does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]."  42 U.S.C. § 12112(b)(5)(A); *see Burchett*, 340 F.3d at 517 (analyzing together failure-to-accommodate claims under the ADA and the MHRA).  Simply put, an employer must "modify their work requirements to enable disabled individuals to have the same opportunities as their non-disabled counterparts."  *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004).  And courts analyze claims for failure to

accommodate using "a modified burden-shifting analysis, because a discriminatory intent is not at issue." *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1074 (8th Cir. 2006) (internal quotation marks and citation omitted).

Applied here, Dulinski bears the initial burden "only to show that the requested accommodation is reasonable on its face." *Peebles*, 354 F.3d at 768 (internal quotation marks and citation omitted). Upon such a showing, the employer is left to "show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *Id.* Reallocating "the marginal functions of a job" may be a reasonable accommodation; however, it is well settled that "an employer need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee." *Dropinski v. Douglas Cnty., Neb.*, 298 F.3d 704, 707, 709-10 (8th Cir. 2002) (internal quotation marks and citation omitted).

Dulinski has identified two allegedly reasonable accommodations that North Homes denied. First, she requested to be placed in an equivalent school-based position located somewhere other than Southwest. (Pl.'s Opp'n at 19.) Second, Dulinski asked for the reasonable accommodation to use intermittent FMLA leave while working at Southwest. (*Id.*) However, neither of these accommodations are reasonable under the circumstances. Primarily, North Homes made an employment decision to remove Dulinski from Southwest per their insistence and then made another employment decision not to place her in another school-based role due to the negative feedback that it received from Southwest. It is not reasonable for Dulinski to continue to demand that she be placed at Southwest or another school-based position under these circumstances. Importantly,

Dulinski has not offered any additional evidence to demonstrate that these employment decisions were pretextual. Accordingly, the Court grants summary judgment on Plaintiff's ADA and MHRA failure-to-accommodate claims (Counts I & 4).

### E.    Retaliation Claims

#### 1.    ADA and MHRA

The ADA and the MHRA prohibit employer retaliation against any employee due to the employee's complaints about discrimination. 42 U.S.C. § 12203(a); Minn. Stat. § 363A.15. These claims are also analyzed under the familiar *McDonnell Douglas* burden-shifting test. *See E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 972 (8th Cir. 2014) (ADA retaliation); *McLain v. Andersen Corp.*, 567 F.3d 956, 969 (8th Cir. 2009) (MHRA unlawful reprisal). To establish a prima facie claim of retaliation pursuant to this framework, Dulinski must show that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) a causal connection exists between the two events. *See Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013) (applying these elements to a retaliation claim under the ADA); *see also Heisler*, 339 F.3d 622, 632 n.6 (explaining that these elements apply to retaliation claims under the MHRA).

As with the other claims, the Court assumes, without deciding, that Dulinski established prima facie cases for retaliation under the ADA and the MHRA. The Court further finds that North Homes has put forward a legitimate, nondiscriminatory reason for terminating Dulinski—her poor performance in a school-based setting, her inability to perform the essential functions of the community-based position, and the expiration of her PTO and FMLA leave. Because Dulinski fails to present additional evidence or make

alternative arguments for why these reasons are pretextual in relation to these causes of action, the Court finds that they fail as a matter of law for the same reasons outlined above. Therefore, the Court grants summary judgment on Dulinski's retaliation claims under the ADA and the MHRA (Counts 2 & 5).

### 2.   FMLA

The FMLA prohibits employers from retaliating against an employee for asserting his or her rights under the FMLA. *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002); 29 U.S.C. § 2615(a)(2)). Courts apply the *McDonnell Douglas* burden-shifting analysis to this claim as well. *Haskell*, 952 F. Supp. 2d at 848. To establish a prima facie case of FMLA retaliation under that framework, a plaintiff must show that "(1) she engaged in activity protected under the FMLA, (2) she suffered a materially adverse employment action, and (3) a causal connection exists between her conduct and the adverse employment action." *Id.*

Dulinski argues that she was terminated in retaliation for taking FMLA leave because Brown referenced her early departures—which were FMLA approved—in his email. (*See* Pl.'s Opp'n at 14-15.) To support her position, she cites *Sparenberg v. Eagle Alliance*, Civ. No. JFM-14-1667, 2015 WL 6122809, *1, 6 (D. Md. Oct. 15, 2015). (*Id.* at 14.) But *Sparenberg* does not support Dulinski's argument.

In *Sparenberg*, the court found that the plaintiff had raised a genuine issue of material fact on his FMLA interference claim.[5]  2015 WL 6122809, *4-6.  Plaintiff worked as an information technology contractor at a client's business.  *Id.* at *1.  After a decade working for his employer, his wife became sick, and he was approved to take FMLA leave to care for her.  *Id.*  Shortly before taking his second FMLA leave, an employee of the client emailed plaintiff's employer, requesting that plaintiff be replaced because he was "sick quite often or has to take off for his wife's illness" and because he had weak technical skills.  *Id.* at *2.  During many subsequent conversations, the client repeatedly referred to plaintiff taking time off to care for his wife.  *Id.* at *5.  Despite knowing his FMLA status, his employer eventually moved him to a different job that paid less, citing poor technical skills.  *Id.*  In response, plaintiff argued that his employer's reason of was pretextual.  *See id.* at *6.  The court agreed, explaining in part that, although the client's email mentioned his poor performance, it seemed to be a secondary concern because it was made after discussing plaintiff's absences.  *Id.* at *5.  Accordingly, the court denied summary judgment on plaintiff's FMLA interference claim.  *Id.* at *5-6, 10.

Here, Brown's email clearly focuses on Dulinski's performance, as outlined above.  Although it references her absences, nothing suggests that her performance is deficient, or that she should be removed, due to her health.  Unlike *Sparenberg*, where the employer repeatedly requested that plaintiff be replaced *because* he had to "take off for his wife's

---

[5]    All claims under 29 U.S.C. § 2615(a) are technically "interference" claims because they appear under the heading "*Interference* with rights."  *Pulczinski*, 691 F.3d at 1005 (emphasis in original).

illness," there is no evidence at all that Brown wanted Dulinski to leave because of her health issue.  Put differently, Dulinski's health was of no concern to Southwest; the email is entirely focused on her performance.

Moreover, North Homes' decision to remove Dulinski from Southwest occurred after speaking with Brown on Monday, April 1st.  (DelGreco Decl. ¶¶ 11, 13.)  That decision was based on Rubesh's conversation with Brown where he "was very direct" that "he just did not feel that Tennelle could work in their program any more" and "could not be allowed back to Southwest Elementary."  (Rubesh Dep. 40:7-9; Brown Decl. ¶ 10.)  It was also based on the approval of Brunetta, the director of Southwest's special education program.  (Rubesh Dep. 40:24-41:5.)  There is no evidence that Dulinski's health was mentioned in either of these conversations.  Thus, the Court grants Defendant's motion for summary judgment on Dulinski's FMLA retaliation claim (Count 7).

### F.    FMLA Entitlement Claim

The Eighth Circuit recognizes an entitlement claim, arising under § 2615(a)(1), that occurs "where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act."  *Pulczinski*, 691 F.3d at 1005.  Under the FMLA, an employer must "restore its employee 'to the position she held when the [FMLA] leave began or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment.' "  *Huwe v. Brennan*, Civ. Nos. 15-3687, 17-1647 (PAM/LIB), 2018 WL 2144294, at *6 (D. Minn. May 9, 2018) (quoting *Cooper v. Olin Corp.*, 246 F.3d 1083, 1090 (8th Cir. 2001)).  An employee proceeding on this theory need not show that

an employer acted with discriminatory intent.  *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 979 (8th Cir. 2005).

Dulinski contends that North Homes failed to restore her to the same position at Southwest "or to place her into an equivalent position" after she used intermittent FMLA leave on March 26 through 28.  (Pl.'s Opp'n at 12.)  Although she concedes that, in the community-based position, she would have continued to work as an MHP and that her salary would have remained the same, (*id.* at 12-13; Dulinski Dep. 89:23-90:3; DelGreco Decl. Ex. B), she contends that it was not an equivalent position because she "was not in one place" and "[t]he hours changed" to include "working weekends" and "holidays." (Dulinski Dep. 57:24-58:2.)  As such, she believed it was a "different job description than the day treatment position [she] was hired for."  (*Id.* at 58:3-5.)

In the community-based position, Dulinski would have continued to work as an MHP and provide skills training, and her salary would have remained the same.  (*See* DelGreco Decl. Ex. B. at 1; Dulinski Dep. 89:23-90:3.)  Further, the major job duties are described identically to some of the competencies required for the school-based position. (*Compare* DelGreco Ex. B at 2, *with* 2019 Annual Review at 2-3, 6.)

Dulinski is correct that the community-based job required a change in hours and change in location.  In general, "an employee 'is ordinarily entitled to return to the same shift or the same or an equivalent work schedule.' "  *Haskell*, 952 F. Supp. 2d at 845 (quoting 29 C.F.R. § 825.215(e)(2)).  Courts have found that a change in hours can create a genuine issue of fact as to whether plaintiff has been offered an equivalent position.  *Id.* at 845-46; *see also McFadden v. Seagoville State Bank*, Civ. No. 3:08-cv-0467-B, 2009 WL 37596,

*9 (N.D. Tex. Jan 6, 2009) (finding that a dispute of material fact precluded summary judgment on whether plaintiff was offered an equivalent position "because the hours were different").  In *McFadden*, the court also found that changing an employee's worksite, which added an additional 40 minutes of driving each day, created a dispute of material fact.  2009 WL 37596, *8.  Because Dulinski has presented evidence that the community-based position required different hours and occurred at a different location, she has most likely presented sufficient evidence to make a threshold showing on her FMLA entitlement claim.

However, this does not end the Court's analysis.  The FMLA does not create strict liability for employers on entitlement claims.  *Olinger v. Renville Cnty. Hosp. & Clinics*, 423 F. Supp. 3d 680, 689 (D. Minn. 2019); *Ballato v. Comcast Corp.*, 676 F.3d 768, 772 (8th Cir. 2012).  Even where, as here, an employee makes a threshold showing to support an entitlement claim, an employer is not liable if it can show that "the employee's restoration rights would have been affected in the same way if the employee had not taken FMLA leave."  *Id.*  Put differently, "[a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."  29 C.F.R. § 825.216(a).   It is the employer that bears the burden "to prove the reason for [its action] was unrelated to the FMLA."  *Phillips v. Mathews*, 547 F.3d 905, 911 (8th Cir. 2008).

Here, North Homes has shown that Dulinski would have been removed from her position at Southwest and been offered the community-based position even if she had not taken FMLA leave on March 26 through 28.  North Homes received Brown's email on

March 29.  As explained above, this email triggered North Homes to follow-up with Brown regarding his email.  (*See* DelGreco Decl. ¶¶ 11-13; Rubesh Dep. 39:17-20; Brown Decl. ¶ 10.)  It also contextualized the prior concerns expressed by the ESPs.  (*See generally* ESP Complaints; *see also* Rubesh Dep. 49:2-4 ("Yeah, so there would have been—these were ongoing concerns . . . I'm not just going to sugar coat it.").)  The unrefuted testimony is that, given this information, North Homes was required to remove Dulinski from Southwest and that it could not place her in a different school-based position.  (DelGreco Decl. ¶¶ 13, 15; Stephens Dep. 113:21-114:14; Wilk Decl. Ex. 11 ("At this time the Community Based CTSS Mental Health Practitioner position is the only position that we had available to you based on the performance concerns that were discussed with you on Monday April 1st.").)  And there is no evidence suggesting that Dulinski's FMLA leave played any role in these decisions.

Lastly, Plaintiff draws a distinction between continuous and intermittent FMLA leave, asserting that North Homes interfered with her FMLA entitlement by forcing her to take continuous FMLA leave.  (Pl.'s Opp'n at 1, 13-14, 18.)  The Eighth Circuit has not explicitly recognized this type of entitlement claim under the FMLA.  *Walker v. Trinity Marine Prods., Inc.*, 721 F.3d 542, 544 (8th Cir. 2013) ("This court has not addressed whether placing an employee involuntarily on FMLA leave is a form of interference made actionable by the statute.").

But even assuming that such a cause of action exists, Dulinski's claim fails.  The Sixth Circuit has explained that this type of entitlement claim "ripens only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the

employee was wrongfully forced to use FMLA leave in the past." *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 449 (6th Cir. 2007). Because Dulinski does not allege that she was denied FMLA leave as a result of North Homes forcing her to take continuous FMLA leave, her claim is not ripe. *See Walker*, 721 F.3d at 544-45 (affirming dismissal of this claim because "if forced leave can amount to interference with a right provided under the FMLA, it can do so only if the employer's action prevents the employee from using benefits to which she is entitled under the Act"). Instead, as explained *Walker*, "[t]he statute entitled [Dulinski] to a certain amount of leave," 721 F.3d at 545, and North Homes never interfered with that entitlement.

What is more, nothing prohibits North Homes from placing an employee "on involuntary continuous leave" when "limitations require[] continuous leave." *Brown v. Gestamp of Alabama LLC*, Civ. No. 2:16-cv-1862-KOB, 2018 WL 3455687, at *6 (N.D. Ala. July 18, 2018); *see also Moss v. Formosa Plastics Corp.*, 99 F. Supp. 2d 737, 741 (M.D. La. 2000) ("[T]here is nothing in the statute or jurisprudence which prevents an employer from placing an employee on unpaid leave.") To be clear, North Homes made an employment decision to remove Dulinski from working as in MHP in a school-based setting. The Court has found that explanation legitimate and non-pretextual. The only question that remains, then, is whether Dulinski's medical restrictions prevented her from working as an MHP in a community-based setting, which they did. Therefore, as explained in *Brown*, Dulinski's restrictions required continuous FMLA leave.

For these reasons, the Court grants North Homes' motion for summary judgment on Dulinski's FMLA entitlement claim (Count 6).

III.     **CONCLUSION**

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that the Motion for Summary Judgment [Doc. No. 28] filed by Defendant North Homes, Inc. ("North Homes") is **GRANTED** as to all of the Counts in the Complaint.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: August 16, 2022                           s/ Susan Richard Nelson
                                                 SUSAN RICHARD NELSON
                                                 United States District Judge